**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

JUL – 2 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**Alexandria Division**

|  |  |
|---|---|
| JATINDER SHARMA, <br>          Plaintiff, <br><br>     -v- <br><br> USA INTERNATIONAL, LLC, *et al.*, <br>          Defendants. | Civil No. 1:13-cv-1573 <br><br> Hon. Liam O'Grady |

## MEMORANDUM OPINION

This matter comes before the Court on the defendants' motion for summary judgment and motion in limine. (Dkt. Nos. 45, 63). Plaintiffs have opposed the motions, (Dkt. Nos. 56, 66), and defendants have replied. (Dkt. Nos. 57, 68). The court heard oral argument on May 8, 2015. During the hearing, plaintiffs asked to submit supplemental exhibits to the Court. The Court granted this request. Having considered the pleadings, exhibits, and heard oral argument, the Court grants summary judgment for the reasons that follow.

### I. Background

Defendant USA International, LLC ("USA International") owned and operated a Checkers restaurant and an Auntie Anne's restaurant inside of a Walmart beginning in November 2012.[1] Defendant Khalil Ahmad ("Ahmad") owned 90% of USA International, and defendant Mahrah Butt ("Butt") owned 10% of USA International.

Sometime in February or March of 2013, Ahmad and plaintiff Jatinder Sharma ("Sharma" or "plaintiff") were introduced through Muhammad Khan ("Khan"), an individual

---

[1] Checkers is a burger chain and Auntie Anne's is a pretzel chain.

who served as a certified public accountant for Ahmad and Sharma separately.[2] Ahmad was interested in selling ownership of the restaurants because he was acquiring a Steak 'n Shake franchise and he was uncertain whether he would be allowed to have two burger chains. *See* Pls.' Ex. 5, Dep. of Ahmad at 52:3 – 7. Sharma, a businessman who owned three 7/11 franchises but had not previously owned a fast food restaurant, became interested in buying the restaurants because he had previously heard from Khan that the restaurants were doing very well in sales. *See* Pls.' Ex. 1, Dep. of Sharma at 24 – 27.

Prior to entering the Preliminary Agreement, Sharma received statements regarding the 2012 tax returns filed for Checkers and Auntie Anne's. The tax documents indicated that the restaurants' combined monthly sales were approximately $75,000 per month for the months of November and December of 2012. *See id.* at 28:14 – 29:11. Sharma could not recall whether Khan or another individual provided this information to him. *Id.*

When Ahmad and Sharma met, Ahmad reportedly told him that the business "did about [$120,000] in a matter of…40 days from November through December 2012…" *Id.* at 36:14 – 18. Ahmad admitted in his testimony that he showed Sharma invoices for January and February of 2012 and that he told Sharma sales were low, but would pick up in later months. *See* Pls.' Ex. 5, Dep. of Ahmad at 57 – 58.

Khan drafted a contract for Sharma to purchase the Checkers and Auntie Anne's from USA International. On March 23, 2013, Sharma executed the Conditional Asset Purchase Agreement, identified by the parties as the Preliminary Agreement. The Preliminary Agreement called for a purchase price of $720,000 and included a contingency clause requiring the combined revenue from monthly sales in both stores to be at least $90,000 during the last two months prior to settlement. Sharma paid a $50,000 deposit as required by the contract. Ahmad

---

[2] Khan is not a party to this action.

admitted in his deposition that the $720,000 price was based in part on the restaurants being able to do $60,000 to $70,000 in combined monthly sales revenue. *See* Pls.' Ex. 5, Dep. of Ahmad at 67:20 – 68:1.

### Final Sale Agreement

After formation of the Preliminary Agreement and before execution of the final Sale Agreement, Sharma received from the defendants two cash flow income statements, also known as profit/loss statements, via Khan.[3] Ahmad confirmed during his deposition that the profit/loss statements were created by Khan based on information provided by Ahmad and Butt. *See* Pls.' Ex. 5, Dep. of Ahmad at 76 – 80. Butt regularly provided sales figures to Khan—or to Ahmad, who forwarded the figures to Khan—via phone call or text message. *See* Pls.' Ex. 6, Dep. of Butt at 23:15 – 24:20. She also testified that she knew Khan and/or Ahmad were providing Sharma with monthly sales figures based on the numbers she provided. *Id.* at 77:5 – 78:20. Additionally, Butt stated that she gave Sharma verbal assurances regarding sales figures on about three occasions during the spring of 2013. *Id.* at 86:1 – 11.

In mid-April 2013, Sharma attended meetings with Checkers corporate officials in Tampa, Florida. The Checkers representatives told him that the purchase price of $720,000 was "higher" than it should be and the "business is not worth that much." Pls.' Ex. 1, Dep. of Sharma at 59 – 60. Because Checkers did not approve the purchase price of $720,000, Sharma negotiated a lower purchase price with Ahmad, reflected in a modified contract identified by the parties as the Sale Agreement. *See id.* at 64.

---

[3] Sometime in April of 2013, Sharma received a profit/loss statement showing that average monthly gross sales from January through March 2013 totaled $59,416. *See* Defs.' Ex. 3, Dep. of Sharma at 24:6 – 15; *see also* Ex. 3 to Second Am. Compl. In May 2013, Sharma received a statement showing gross sales for April 2013 totaled $75,712. *Id.*

On May 21, 2013, the parties executed the final Sale Agreement. This contract modified two material terms from the original Preliminary Agreement. The final Sale Agreement (1) reduced the purchase price to $600,000 and (2) removed the $90,000 monthly sales contingency clause. The modified contract also specified the allocation of the purchase price of each restaurant: $250,000 for the purchase of Auntie Anne's and $350,000 for the purchase of Checkers. Sharma contends that he relied on the financial statements provided to him by or at the direction of the defendants, particularly the April profit/loss statement, in entering into the final Sale Agreement at the $600,000 purchase price. *See id.* at 64-65.

**Closing Pursuant to the Sale Agreement**

As required by the Checkers franchisors, Sharma sought and received approval of the purchase agreement. On July 23, 2013, Sharma personally obtained a loan commitment from BB&T Bank ("BB&T) for the purchase price. *See* Defs.' Ex. 3, Dep. of Sharma at 26:22 – 27:3. On July 25, 2013, he and his wife created and incorporated plaintiff Haymarket Fastfoods, Inc. ("Haymarket") to close on the sale. At some point thereafter, but prior to closing, Sharma assigned all rights and responsibilities under the Sale Agreement to Haymarket.

Sometime in September, the defendants sent or caused to be sent another financial statement to Sharma, acting as an agent for Haymarket. This statement reflected the profits and loss for the eight months ending in August 2013, showing that the average monthly gross sales were approximately $67,083.62. *See* Defs.' Ex. 3, Dep. of Sharma at 24:13 – 15; *see also* Ex. 4 to Second Am. Compl. Sharma contends that he, acting as an agent for Haymarket, relied on this financial statement and the prior statements in going forward with the closing. *See* Pls.' Ex. 2, Dep. of Sharma at 77:12 – 16.

4

On or about October 11, 2013, Sharma obtained a loan for $489,600 from BB&T on behalf of Haymarket to close on the sale.[4]  On October 14, 2013, Haymarket paid the purchase price plus closing and inventory costs and assumed the lease for the restaurants.

***Sharma's Management of the Business***

After Haymarket took ownership of the restaurants, Butt stayed on as manager for five days to help with the transition. *See* Defs.' Ex. 4, Dep. of Sharma at 9 – 12.  Butt had previously worked for Ahmad as a manager of his Subway restaurant before coming to manage the Checkers, and this was the first and only venture of Ahmad's of which she had partial ownership. *See* Pls.' Ex. 6, Dep. of Butt at 33:4 – 10.  Butt testified that pursuant to an agreement with Ahmad, her 10% stake was limited to the Checkers side of the business, and she would receive $18,000 from the sale of the Checkers, whether or not that constituted 10% of the proceeds of the sale. *See id.* at 61:19 – 22; 128 – 129.

Sharma observed slow sales during that first week, and he soon became convinced that the defendants had been inflating their sales numbers in the profit/loss statements.  He testified that this conclusion was based on his own research as well as the statements of two employees. *See* Pls.' Ex. 1, Dep. of Sharma at 101:4 – 5.  With respect to his research, Sharma stated that he asked the person who delivered sandwich buns to the restaurant whether Sharma's purchases during the first week were much lower than the prior purchases. *Id.* at 79 – 80.  The delivery person responded in the negative, saying Sharma's purchases were "in line" with prior purchases. *Id.* at 80.  A few days later, Sharma met with the sales representative for the main vendor and asked the same question comparing his orders to orders under prior ownership.  The representative told him his orders were "in line" with the prior orders. *Id.*

---

[4] Evidently the bank conducted an appraisal of the business, but that appraisal has not been submitted as evidence in the record.

Sharma further testified that he reviewed the inventory purchase history when Haymarket took over the business. The implication of Sharma's testimony is that he believed USA International's food purchases were significantly lower than their sales figures would require. *Id.* at 114 – 115. However, Sharma's language on this point is couched in hypotheticals and is therefore somewhat unclear. *See, e.g., id.* at 114:5 – 7 ("My research, what I did is I found out that if we have let's say a hundred [w]ings that I purchased, I cannot sell 200 [w]ings").

Sharma also looked at the transaction history from the sales computer. The sales data showed that on multiple occasions, sales were wrung up very fast and many customers were being served per minute. *Id.* at 113. He found that the dollar amounts of the sales also tended to be relatively high. However, Sharma conceded that he was aware the computers and cash registers were not functioning properly during that time period. *Id.* at 115:15 – 20. Plaintiffs have also attached an apparent printout of the computer's records of sales occurring on April 21, 2013. *See* Pls.' Ex. 4. The sales are logged under Butt's name, and there appear to be multiple instances of large numbers of sales being processed in as little as one minute. *Id.*

Finally, plaintiffs have submitted records of USA International's bank account, the sole account used in the operation of the restaurants under USA International's ownership. *See* Pls.' Ex. 7. Plaintiffs argue that the records show lower deposit amounts than would be expected based on the reported sales figures.

Sharma spoke with two employees who had worked with Butt when she managed the Checkers restaurant. John Debrah, who no longer works at Checkers, reportedly told Sharma that he saw Butt ring up sales multiple times when no customer was there. *See* Pls.' Ex. 1, Dep. of Sharma at 101:7 – 16. Sonia Romero, an employee who still works at Checkers, gave Sharma

a similar account. Both Debrah and Romero only observed Butt using the cash register in this manner at the Checkers restaurant.

Romero was deposed in this case, and she testified that she has worked at Checkers since it opened and she continues to work there. *See* Dep. of Romero. at 6:8 – 11. Her job responsibility consisted of working in the kitchen making hamburgers, and while she could see the registers from the kitchen, she has never operated the cash registers or been trained to operate the registers. *Id.* at 7:12 – 19; 9:17 – 22; 21:1 – 4. She testified that when a customer orders, the order appears on the computer and is printed on a paper receipt. As a member of the kitchen staff, she received the paper receipt, and after making the sandwich, she put the receipt in the customer's bag of food. *Id.* at 15-16. Although there were two registers, Romero stated that only one was used at a time. *Id.* at 21:5 – 8.

Romero further testified that when she began working at Checkers, Butt took orders from customers and no one else operated the cash register. *Id.* at 16; 19:8 – 10. On multiple occasions, Butt told her not to make a sandwich even though a paper receipt had been printed. *Id.* at 16 – 17. Butt would "bring out this report that she would make, then [Romero] would not make up the food." *Id* at 16:21 – 22. Romero could not remember how many times this occurred, but she said that many receipts came out when it did occur. *Id.* at 17:1 – 6. When asked during her deposition whether Butt could have been training workers to operate the cash register, Romero responded no. *Id.* at 22:1 – 3. Since Sharma took over the Checkers restaurant, Romero has never been asked not to make a sandwich when a receipt was produced. *Id.* at 19:15 – 18.

On December 4, 2013, Sharma filed suit against the defendants in the Circuit Court for Prince William County, Virginia. Defendants removed the case to this Court on December 26, 2013. Plaintiffs filed a second amended complaint, the operative complaint, on August 20, 2014.

## II. Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.* at 248. Finally, in making a summary judgment determination, the court must view the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-588 (1986) (citation omitted).

## III. Discussion

## A. Fraud

Counts I and II of the second amended complaint allege that the defendants engaged in fraud against Sharma and Haymarket respectively. To establish a valid claim of fraud under Virginia law, a plaintiff must show (1) a false representation (2) of a material fact (3) that was made intentionally and knowingly (4) with the intent to mislead, (5) reasonable reliance by the party misled, and (6) resulting damage to the party misled. *See Albayero v. Wells Fargo Bank, N.A.*, No. 3:11cv201, 2011 WL 4748341, at *4 (E.D. Va. Oct. 5, 2011) (citations omitted). The

elements of fraud must be proven by clear and convincing evidence. *See Ashmore v. Herbie Morewitz, Inc.*, 252 Va. 141, 147 (1996) (citation omitted). "Clear and convincing evidence is that degree of proof which will produce in the mind of the trier of facts a firm belief or conviction concerning the allegations sought to be established." *Id.* (citation omitted).

"It is true that, even though fraudulent, a misrepresentation made subsequent to, or a concealment of a fact arising after, [f]ormation of a contract cannot constitute fraudulent inducement to enter into the contract." *Ware v. Scott*, 220 Va. 317, 319 (1979). Although fraudulent inducement to enter the contract necessarily must occur before the contract has been entered into, the Supreme Court of Virginia has held that:

> *Performance* of an executory contract may be fraudulently induced. Such is the case when one party fraudulently leads the other to believe that a condition precedent to the latter's duty to perform has been fulfilled. By the same logic, fraudulent inducement to perform may arise when one party induces the other to perform by concealing some fact which excuses performance by the latter. For example, under certain circumstances performance may be excused because the contract was formed under a mutual mistake of material fact.

*Id.* at 320 (emphasis added) (citations and international citation omitted).

"A fact is material when it influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred." *Albayero*, 2011 WL 4748341 at *4 (quoting *Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 563 (1956)).

1. Sharma's Fraud Claim for Inducement to Enter the Contract and to Perform the Contract

Defendants argue that Sharma's fraud claim must fail because he cannot establish that the financial statements were material to his decision to enter into the contract. Specifically, defendants argue that Sharma could not have relied on the financial statements before he entered into the initial agreement on March 23, 2013, because no financial statements were provided to him until after he entered into the Preliminary Agreement.

The Court rejects this argument. First, the defendants fail to note that allegedly fraudulent statements received after Sharma signed the Preliminary Agreement may also form the basis of a claim for fraudulent inducement of performance of the contract. The Preliminary Agreement is not the operative contract, and there is no dispute that here, Sharma received two profit/loss statements between executing the Preliminary Agreement and the final Sale Agreement.

Second, the evidence demonstrates that Sharma did receive allegedly fraudulent statements prior to executing the Preliminary Agreement. Sharma testified that he relied on verbal statements and tax returns given to him by the defendants before entering into the Preliminary Agreement. *See* Pls.' Ex. 1, Dep. of Sharma at 40-42. Additionally, Sharma testified that while he was with Ahmad during their first meeting, Ahmad called the Checkers/Auntie Anne's restaurants to get a sales estimate for that day. *Id.* at 41. Ahmad told Sharma that the stores had done $2,000 and counting in combined sales for that day. *Id.* Ahmad also admitted to showing Sharma invoices. Thus, there is evidence in the record that Sharma received allegedly false statements before entering into the Preliminary Agreement.

### 2. Haymarket's Claim for Fraudulent Inducement to Perform a Contract

Defendants also argue that Haymarket cannot establish fraud because the alleged fraudulent activity occurred before Haymarket existed. Sharma formed Haymarket on July 25, 2013, after the parties entered into the operative Sale Agreement. While Haymarket obviously cannot state a claim for fraudulent inducement to enter into a contract that predated Haymarket's existence, Haymarket may bring a claim for fraudulent inducement to perform. *See Ware*, 220 Va. at 319. *But see Scheduled Airlines Traffic Offices, Inc. v. Objective Inc.*, 180 F.3d 583, 589 (4th Cir. 1999) (finding no fraudulent inducement of performance as contemplated in *Ware*,

because plaintiff would not have been free of its contractual obligations even if defendant had not concealed certain information).

Because Sharma executed the contract, he had a duty to close on the sale, which he assigned to Haymarket.[5] Haymarket's duty to close on the sale was predicated on the existence of a valid contract. As a matter of contract law, Sharma could have rescinded the contract if he had learned of the alleged fraudulent misrepresentations which induced him to enter the contract. *See, e.g., Persaud Cos., Inc. v. IBCS Grp., Inc.*, 425 F. App'x 223, 226 (4th Cir. Apr. 25, 2011) ("Under Virginia law, a false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract") (citation and internal quotation marks omitted). Sometime in September of 2013, Sharma received from the defendants yet another allegedly fraudulent profit/loss statement on behalf of Haymarket.

By continuing to provide allegedly fraudulent statements to Sharma, acting as Haymarket's agent, the defendants misrepresented or concealed facts that would have allowed Sharma to rescind the contract on the ground of fraudulent inducement. Haymarket would have had no duty to close if Sharma had rescinded the contract on that basis. Accordingly, Haymarket may state a claim for fraudulent inducement of performance.

### 3. Damages

Defendants assert that summary judgment should be granted because the plaintiffs have failed to introduce sufficient evidence of damages on their fraud claims.

---

[5] Plaintiffs argue that Haymarket had "every right to cancel the purchase" under the Sale Agreement, but they point to no specific provision of the contract in support of this argument. Pls.' Mem. in Opp'n at 5 n.2. The Court's review of the contract indicates that plaintiffs did not have a contractual right to cancel the agreement unilaterally. The contract merely notes that the agreement was contingent on plaintiffs' securing financing, franchisor approval, and landlord approval, *see* Ex. 2 to Second Am. Compl., all of which plaintiffs were obligated to do in good faith. *See, e.g., Wolf v. Fed. Nat'l Mortg. Ass'n*, 512 F. App'x 336, 345 (4th Cir. Feb. 28, 2013) ("[I]n Virginia, every contract contains an implied covenant of good faith and fair dealing") (quoting *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009)).

> Generally, a person who acquired property by virtue of a commercial transaction and who has been defrauded by false representations is entitled to recover as damages the difference between the actual value of the property at the time the contract was made and the value that the property would have possessed had the representation been true.

*Patel v. Anand, LLC*, 264 Va. 81, 86-87 (2002) (quoting *Prospect Dev. Co., Inc. v. Bershader*, 258 Va. 75, 91 (1999)).

"In order to recover actual damages, [plaintiff] must prove the extent of [his] damages with reasonable certainty. [He] need not prove the exact amount of loss with mathematical precision, but [his] loss must be established by facts and circumstances that would permit an intelligent and probable estimate thereof." *Reynolds v. Reliable Transmissions, Inc.*, No. 3:09cv238, 2010 WL 2640065, at *3 (E.D. Va. June 29, 2010) (citing *Gertler v. Bowling*, 202 Va. 213, 215 (1960) (internal citation omitted)). "However, when the amount of damages is left to conjecture or speculation, there can be no recovery therefor." *Holz v. Coates Motor Co.*, 206 Va. 894, 897 (1966) (citing *Gunnell v. Nello L. Teer Co.*, 205 Va. 28, 35 (1964)).

Several Virginia cases are instructive. In *Patel*, the Supreme Court of Virginia reduced the plaintiff's damages award on claims of fraud, breach of fiduciary duty, and breach of contract, because plaintiff had not introduced sufficient evidence. *Patel v. Anand, LLC*, 264 Va. at 86-87. "Anand failed to present evidence of the actual value of the ground lease that it bargained for—a ground lease which would have had a clear title—and the value of the ground lease that it actually received—a ground lease with a cloud on the title." *Id.* at 87. The court found the "record simply [did] not contain this evidence," *id.*, even though the plaintiff argued that it had presented evidence of the amount it paid to purchase the ground lease ($900,000); the amount it paid to renovate the property; the amount it paid in lease payments and franchise and application fees; and

the amount that other prospective purchasers had offered to pay for the ground lease. *Id.* at 86.

The *Gertler* court affirmed the trial court's award of damages on plaintiff's breach of warranty claim (treated by the court as a claim for breach of duty under a bailment contract) regarding the purchase and repair of a used vehicle. *Gertler,* 202 Va. at 213 – 214. The plaintiff claimed that she had returned the vehicle to the defendant dealer for repairs approximately eight months after purchase, and that the vehicle had been rendered worthless while in the defendant's possession because vandals stripped it of its parts. *Id.* at 214 – 215. On the issue of damages, the plaintiff presented evidence that she paid $595 for the vehicle; that almost immediately after the purchase, the vehicle had required several repairs during which plaintiff had little use of the vehicle; and that the vehicle became inoperable when the engine block cracked. *Id.* at 215. Further, the court found the evidence showed that there was "little or no depreciation" from plaintiff's use of the vehicle. *Id.* Under these circumstances, "there was sufficient evidence before the trial court for it to intelligently and fairly estimate with reasonable certainty the quantum of damages at the time of the loss." *Id.* at 216.

In *Reynolds,* the district court examined the issue of damages after having previously granted summary judgment to the plaintiff as to liability only. *Reynolds,* 2010 WL 2640065, at *1. The plaintiff claimed actual damages in the amount of $1,750 on her claims of fraud, breach of contract, and violation of the Virginia Consumer Protection Act. *Id.* at *3. This figure was based upon the testimony of an expert witness who opined that the value of the property at issue, a vehicle, was approximately $2,000 before it was towed to defendant's place of business, and $250 upon its return to the plaintiff. *Id.* However, because the expert had not personally

13

inspected the vehicle before Reynolds towed it to the defendant, the court found his estimate that the vehicle would have been worth $2,000 was "based upon little more than speculation." *Id.* The court distinguished *Gertler*:

> Unlike the evidence presented by the plaintiff in *Gertler*, which fairly accounted for the diminution of in value of the used vehicle, the evidence that Reynolds has presented is insufficient to establish with a reasonable degree of certainty the value of the vehicle before it was delivered to [defendant] for repairs. Without such evidence, the Court cannot determine the loss in value to the vehicle that [plaintiff] has incurred.

*Id.*

In *Holz*, the Virginia Supreme Court held that the evidence failed to establish the difference between the value of the property at issue, a vehicle, free from material defects and the value of the automobile with the alleged defects. *Holz*, 206 Va. at 897. Like the *Reynolds* court, the court found that *Gertler* was distinguishable. The court noted that in *Gertler*, "[t]he automobile had been used very little and was inoperable when it was towed to [defendant seller's] garage, and was in its care when it was [stripped] by unknown parties." *Id.* By contrast, the facts established in *Holz* failed to "establish the value of the allegedly defective automobile. It was not contended that the automobile did not run, or that any essential part of the car continuously failed to function…Plaintiff's statement that the automobile was worthless to him does not establish the fact that it had no value." *Id.* Accordingly, the court set aside the jury's damages award to the plaintiff as "purely speculative." *Id.* at 898. *See also Carstensen v. Chrisland Corp.*, 247 Va. 433, 443 – 445 (1994) (affirming dismissal of breach of duty claim because plaintiffs did not show that decreased value of real property was result of defendants' misrepresentations).

The property at issue in this case is a business comprising two restaurants. The measure of the business's bargained-for value is the value of the business if it were doing

roughly $70,000 in average monthly sales. The measure of the business actually received by the plaintiffs is the value of a business with lower sales amounts and using fraudulent means to inflate its sales figures.

### Valuing a Business

The defendants in the instant case argue that plaintiffs have not submitted sufficient evidence allowing the trier of fact to estimate with reasonable certainty the amount of damages plaintiffs sustained. Plaintiffs argue without any citation that courts use a "flexible approach" in determining whether sufficient evidence of value exists.[6] Pls.' Mem. in Opp'n at 13.

There are three generally accepted methods for valuing a business: the income approach, the market approach, and the asset-based approach. *See United Co v. Keenan*, No. 1:06cv71, 2007 WL 4260930, at \*17 (W.D. Va. Nov. 30, 2007)[7] (citing Shannon P. Pratt, Valuing a Business, the Analysis and Appraisal of Closely Held Companies, 46 – 47 (4th ed. 2000)). "[T]he three broad approaches are not independent of each other but are interrelated." Shannon P. Pratt, *et al.*, Valuing a Business, The Analysis and Appraisal of Closely Held Companies, 62 (5th ed. 2008).

"In general, a market-based appraisal concentrates on a company's historical performance measures and, by reference to guideline public company multiples, attempts to determine the price at which the stock of a company with those performance measures would trade." *Wall v. CIR*, 81 T.C.M. (CCH) 14, at \*9 (Tax Ct. 2001). "An income-based appraisal, by contrast, is more forward looking; it attempts to predict, and then determine the present value of, all future

---

[6] Upon its own research, this court has only discovered references to a "flexible approach" to valuing businesses in cases of divorce. *See, e.g.*, Swisher, Peter N., *et al.*, Va. Prac. Family Law § 11:25, Valuation of Property: Proof and Evidence (2015 ed.) ("Virginia has adopted a flexible approach in the valuation of businesses, stating that the standard is that value that represents the property's 'intrinsic worth' to the parties upon divorce") (citations omitted). The instant case is obviously not a matter of divorce or family law.

[7] In *Keenan*, the court granted defendant's motion to exclude the testimony of plaintiff's expert witness because the expert ignored the established methods and instead formulated his own method of conducting business valuation. *Keenan*, 2007 WL 4260930 at \*18.

returns an investor could expect to receive from an investment in the subject company." *Wall*, 81 T.C.M. (CCH) 14 at *9 (citing Pratt, *et al.*, Valuing Small Businesses and Professional Practices 236 – 240 (3d ed.1998)). The asset-based approach, which does not appear to be implicated in the instant case, aims to determine "the fair market value of the adjusted net assets" of a company. *In re Vecchitto*, 235 B.R. 231, 235 (D. Conn. Bankr. Ct. 1999) (citation omitted).

**Bargained-for Value**

There is conflicting precedent in Virginia regarding whether the sale price can be taken as the bargained-for value of the property. In *Holz*, the Virginia Supreme Court indicated that the sale price of a vehicle could be taken as the value of the vehicle without the defect. *See Holz*, 206 Va. at 897 (1966) ("The sale price may be taken as the value of the car without the defective parts"). *See also Carstensen*, 247 Va. at 444 (1994) ("The value of the property bargained for here is based on the land without the potential of an easement...and without the potential placement of future easements...This value is the actual price paid by the [plaintiffs] for their respective real property"); *Gertler*, 202 Va. at 215 (1960) ("Evidence of the original cost of a used automobile is admissible on the issue as to its value at the time of loss, on the theory that the present value of a used article can be determined with a reasonable degree of certainty by taking such original cost and making due allowance for elements of depreciation"). However, most recently, the Virginia Supreme Court found that the plaintiff had not submitted evidence of either the actual value of the property or the bargained-for value, even though the purchase price of $900,000 was evidently part of the record. *See Anand*, 264 Va. at 86 – 87 (2002).

In the instant case, the sale price of the restaurants was $600,000. Assuming, without deciding, that the sale price constitutes sufficient evidence of the bargained-for value, the Court

next considers whether there is sufficient evidence of the actual value of the restaurants at the time of the sale.

***Actual Value***

Sharma indicated that he believes the business was actually worth around $360,000 at the time of purchase. The Court notes that there is somewhat conflicting evidence in plaintiffs' own accounts of what methods were used to calculate damages. When asked how he calculated the $360,000 figure, Sharma testified at his first deposition on June 19, 2014 that the figure was the result of the "EBITDA multiplied by 3.25." *See* Pl.'s Ex. 1, Dep. of Sharma at 122. Sharma made this statement before plaintiffs submitted their answers to the interrogatories.

On July 7, 2014, Haymarket submitted its answers to defendants' first set of interrogatories. *See* Defs.' Ex. 6. Haymarket's answers state that the plaintiffs' measure of damages is $273,645.96. This figure is the result of subtracting $360,000, the alleged actual value of the business, from the total transaction cost to the plaintiffs of purchasing the business. In other words, plaintiffs' calculation is as follows: the purchase price ($600,000) plus incidental costs of purchasing the business ($33,645.96) minus the purported actual value of the business ($360,000) equals $273,645.96. *See id.* at Answer to Interrogatory 13. Unfortunately, plaintiffs did not explain how they calculated that the actual value of the business is $360,000.

Haymarket then amended its interrogatory answers on August 8, 2014. See Pls.' Supplemental Ex. 1. The amended answers state that plaintiffs used two methods to determine the actual value of the business. *See id.* at Answer to Interrogatory 1. Under the first method, plaintiffs estimated the actual value by multiplying the average weekly sales figures by 36. Plaintiffs assert that they used this method because this is allegedly how Ahmad calculated the $600,000 purchase price of the business. Because Sharma's own average weekly sales had been

17

roughly $10,000, he speculated that the true sales figures for the time period covering USA International's ownership of the business must have been roughly the same. The product of $10,000 and 36 therefore resulted in a total of $360,000, representing plaintiffs' measure of the actual value of the business at the time of purchase.

The other method plaintiffs disclosed in the amended interrogatories involved the EBITDA. EBITDA—earnings before interest, taxes, depreciation, and amortization— is a multiple that can be used to determine the value of a business. *See, e.g., Hayes v. Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 860 (4th Cir. Oct. 17, 2003) ("The equity market value of these companies was calculated as multiples of their estimated [EBITDA] for calendar years 2000 and 2001"). Plaintiffs stated that their profit and loss statements show an average EBITDA of $7,369 per month. Assuming it would take a "conservative" four years for Sharma to realize a return on his investment, the plaintiffs multiplied the EBITDA by 48, resulting in a value of $353,731.[8] *Id.*

In his second deposition, which occurred on September 17, 2014—after plaintiffs amended their answers to the interrogatories—Sharma confirmed that the $360,000 figure was calculated by multiplying the EBITDA figure by 48, based on his expectation of receiving a return on the investment in 48 months. *See* Defs.' Ex. 3, Dep. of Sharma at 58 – 59. Sharma also stated that other than the two listed methods, he had considered no other methodologies in determining the value of his business. *Id.* at 59 – 60.

Plaintiffs argue that they have submitted sufficient evidence in light of *Long & Foster Real Estate, Inc. v. Clay*, 231 Va. 170 (1986). The *Clay* court affirmed the trial court's award of

---

[8] The Court's own calculation demonstrates that the product of $7,369 and 48 is $353,712. However, this particular discrepancy in calculation is of little importance.

damages on a breach of duty claim.[9]  In that case, the plaintiff had presented expert testimony

showing that the actual value of the property at issue, a deed of trust note, was 50% – 60% of the

face amount of the note, while the bargained-for value was 75% – 80% of the face amount of the

note. *Clay*, 231 Va. at 175. The court concluded that this was sufficient evidence to support the

award of damages. *Id.* at 176.

The instant case is distinguishable from *Clay*. Unlike the plaintiff in *Clay*, Sharma and

Haymarket have not submitted any expert testimony to support their estimation of damages.

Although expert testimony is not necessary, there must be sufficient evidence in the record from

which a reasonable factfinder could make an intelligent and probable estimate of the amount of

damages. While it is possible to make such a showing in the absent of an expert, the plaintiffs

have not done so here.

The case at bar is also distinguishable from *Gertler*. Unlike the plaintiff in *Gertler*, who

presented evidence that the vehicle at issue was essentially inoperable as a result of the

defendant's actions, Sharma and Haymarket have not shown that the restaurants they purchased

were completely without value.

The instant case much more closely resembles the cases discussed above in which courts

dismissed claims for failure to prove damages. Like the plaintiff in *Reynolds*, Sharma and

Haymarket's estimation of damages is "based upon little more than speculation." *Reynolds*,

2010 WL 2640065, at *3. The key assumption underlying plaintiffs' $360,000 valuation is the

notion that the Checkers restaurant must have had the same amount of sales under USA

International's ownership as under Haymarket's. Even if the Court accepts this assumption,

there is no evidence that the calculation provided a reliable measure of damages. Plaintiffs'

---

[9] The measure of damages for breach of duty claims appears to be identical to the measure of damages for fraud claims. *See Clay*, 231 Va. at 176 ("Clay's measure of damages was the difference between the value of the note she bargained for in the first contract and the value of the note she actually received").

methods of calculation, as explained in their answers to interrogatories and in Sharma's deposition testimony, do not conform to any of the generally accepted methods of business valuation, nor has plaintiff offered sufficient evidence that their methods are independently reliable.

Plaintiffs argue that they used the first method, multiplying the average weekly sales figures by 36, because that is the method Ahmad used during the sale price negotiations, and Ahmad told him that was the "industry standard formula." *See* Defs.' Ex. 3, Dep. of Sharma. However, the fact that one of the defendants used this method does not make the method a reliable one. Sharma himself testified that he did not know why Ahmad used the number 36. *Id.* The second method does not constitute a proper application of either the income-based or the market-based approaches, both of which may utilize EBITDA. There is simply no evidence in the record, nor is there any supporting argument in the plaintiffs' opposition brief, demonstrating how or why multiplying 36 by the amount of average weekly sales or the average weekly EBITDA results in a reliable estimation of a business's actual value.

Because proof of damages is an essential element of a fraud claim in Virginia, *see Nahigian v. Juno-Loudon, LLC*, No. 1:09cv725, 2010 WL 3418179, at *12 (E.D. Va. Aug. 23, 2010), plaintiffs' failure to submit sufficient evidence of damages is fatal to their claims. The Court therefore grants summary judgment on Counts I and II.

**B. Conspiracy**

Counts III and IV of the complaint allege that the defendants conspired against Sharma and Haymarket. "In Virginia, '[a] common law conspiracy consists of *two or more persons* combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means.' " *Vollette v. Watson*, 937 F. Supp. 2d 706, 727

(E.D. Va. 2013) (alteration in original) (quoting *T.G. Slater & Son, Inc. v. Donald P. and Patricia A. Brennan LLC*, 385 F.3d 836, 845 (4th Cir. 2004)).

> However, the "intracorporate immunity doctrine," which has been adopted by the Virginia Supreme Court and the Fourth Circuit, deems multiple defendants a single entity for the purpose of analyzing a civil conspiracy claim if such defendants are employees or agents of the same entity and are acting *within the scope* of their employment/agency.

*Id.* (emphasis in original) (citing *Fox v. Deese*, 234 Va. 412, 428 (1987)) (further citation omitted).

Defendants argue that the record is "devoid of facts that suggest a meeting of the minds and not mere parallel conduct." *Feeley v. Total Realty Mgmt.*, 660 F. Supp. 2d 700, 712 (E.D. Va. 2009). Plaintiffs argue that there is evidence of a conspiracy because Butt rang up the false sales and Ahmad caused the reports to be sent to Sharma and eventually Haymarket.

The Court agrees with the defendants. Viewing the evidence in the light most favorable to the plaintiffs, the record demonstrates that two Checkers employees saw Butt operating the cash register in a manner that is highly suggestive of ringing up fraudulent sales. There are also computer printouts of the cash register showing large numbers of sales occurring in rapid succession. Plaintiffs have sufficiently demonstrated that Butt rang up fraudulent sales.

However, it is undisputed that the employees never testified that they saw Ahmad engaging in this behavior. Ahmad testified that he only visited the restaurants approximately 10-12 times during the year that USA International operated them. He also said he never reviewed the inventory purchases, which might have alerted him to Butt's alleged activities. Moreover, plaintiffs do not dispute that Butt was the daily manager and she was responsible for keeping track of sales and ordering inventory. Butt provided the sales numbers to Ahmad or Khan, and Khan then provided the numbers to Sharma.

21

Further, there is evidence that Butt had her own reasons to engage in the fraudulent sales. She testified that her 10% stake in the company only pertained to the Checkers side of the business, where the allegedly bogus sales occurred. Her assertion that she would only receive $18,000 from the sale of Checkers is contradicted by the undisputed fact that she owned 10% of USA International and would therefore be entitled to 10% of its profits from the Checkers sale. Ten percent of the contract price allocated to the Checkers restaurant ($350,000) is $35,000. In sum, although there is evidence that Butt had an independent motive to falsify the sales records, which would defeat the defense of intracorporate immunity, there is simply no evidence that Ahmad directed Butt to ring up the fake sales. Indeed, Sharma's own deposition testimony concedes that Sharma does not have any information showing that Ahmad personally knew about the fraudulent sales. Sharma merely believes Ahmad is responsible because he is the primary owner of USA International. *See* Dep. of Sharma at 64 – 66.

Relying on *Garrett v. Langley Fed. Credit Union*, 121 F. Supp. 2d 887 (E.D. Va. 2000), plaintiffs argue that "a conspiracy may be established if the conduct of the parties and the inferences to be drawn from such conduct indicate, at least, a 'tacit understanding' to accomplish the object of the alleged conspiracy." *Garrett*, 121 F. Supp. 2d at 906 (analogizing to criminal context) (citing *Wallace v. United States*, 281 F.2d 656, 663 (4th Cir. 1960)). Even if the Court applied the "tacit understanding" approach, "a showing of parallel conduct does not by itself establish that two parties have agreed to engage in that conduct." *Zurich American Ins. Co. v. Turbyfill*, No. 7:10cv282, 2010 WL 4065527, at *7 (W.D. Va. Oct. 15, 2010) (analyzing Virginia statutory business conspiracy claim) (citation omitted).

The evidence in the record fails to show that Ahmad and Butt had a tacit understanding to defraud Sharma. Without more, the mere fact that Ahmad forwarded the numbers he received

from Butt to Khan or to Sharma does not support a finding that Ahmad conspired with Butt to falsify sales data.

## IV. Motion in Limine

The defendants have moved to exclude evidence and testimony relating to the plaintiffs' calculations regarding the actual value of the business. Defendants argue that the testimony must be excluded because "[d]emonstrating that the value of the property is lower now than it was at the time of purchase is not sufficient." Defs.' Mem. in Supp. of Mot. in Limine at 3 (citing *Nahigian*, 2010 WL 3418179 at *12). The Court will decide the motion even though summary judgment is granted.

Although it is true that the current value of the business is not sufficient to demonstrate the actual value of the business at the time of purchase, the defendants misunderstand plaintiffs' calculations. As discussed above, the plaintiffs' calculations are based on the premise that the amount of sales the restaurants currently have is an accurate estimate of the amount of sales the restaurants had at the time of purchase. Thus, the plaintiffs are not contending that the $360,000 figure represents only the current value. Rather, their assertion is that the actual value of the business at the time of purchase was $360,000, based on the assumption that current sales are equal to prior sales. The soundness of that assumption goes to the weight of the evidence rather than its admissibility. *See, e.g., United States v. 75.746 Acres of Land*, No. cv–08–01829, 2010 WL 1408896, at *3 (D. Ariz. Apr. 7, 2010) (holding that valuation expert's use of financial information from a different farm than the farm at issue affected weight of testimony, not admissibility). Accordingly, the Court will not exclude the evidence on this ground.

The defendants have also moved to exclude Sharma's testimony on the ground that he has not been designated as an expert on business valuation. The Court finds that the plaintiffs

23

were not required to designate an expert in order to introduce evidence of the restaurants' value. *See e.g., Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) ("[Owner] was not required to qualify as an expert to offer opinion testimony concerning Lighting Lube's lost profits") (citation omitted).  Sharma could properly testify as to the amount of sales that occurred since he took ownership of the business in support of his theory that the current sales are identical to the actual sales figures under the defendants' ownership.  Accordingly, the motion in limine is denied.

## V.  Conclusion

For the foregoing reasons, it is hereby

ORDERED that the motion for summary judgment is GRANTED and the motion in limine is DENIED.  An appropriate final order shall issue.

Date:  July 2 , 2015

Alexandria, Virginia

_____ /s/
Liam O'Grady
United States District Judge